IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


NAKISHA BOONE, et al.          :          CIVIL ACTION
                               :
        v.                     :
                               :
CITY OF PHILADELPHIA           :          No. 05-1851


MEMORANDUM

McLaughlin, J.                              November 3, 2009


        The parties have moved for the certification of a class
and approval of a settlement in this case involving the policy of
the City of Philadelphia to strip-search all pretrial detainees
upon admission to the Philadelphia Prison System (PPS).  Class
counsel has also moved for an award of attorneys' fees and
reimbursement of out-of-pocket expenses.  After a hearing held on
September 29, 2009, the Court grants these motions and enters
final judgment and an order of dismissal.


I.   Background

     A.   History of the Litigation

        Class representative Nakisha Boone brought this class
action on behalf of herself and all others who were strip-
searched after being charged with a misdemeanor or other minor
crime.  Ms. Boone was arrested for violating a bench warrant with
an underlying charge of endangering the welfare of a child.  She

was strip-searched before being placed into detention.  She argued that PPS's policy of strip-searching all pretrial detainees upon admission was unconstitutional.  The complaint named the City, the PPS, the Prisons Commissioner, members of the Prisons' Board of Trustees and three of the prison's Deputy Commissioners as defendants.

The class was defined in the complaint as

> [a]ll persons who have been or will be placed into the custody of the PPS after being charged with misdemeanor violations, violations of probation or parole, traffic infractions, civil commitments or other minor crimes and were or will be strip searched upon entry into PPS pursuant to the policy, custom and practice of the PPS and the City of Philadelphia.

Compl. at 7.  The class period commenced on April 21, 2003, and was to extend until the defendants were enjoined from or otherwise ceased enforcing the policy.  Id.

The parties engaged in extensive discovery from July 2005 until November 2005.  This initial period of discovery focused on the PPS's policy.  It included the production of documents relating to the prison policies, an inspection of the PPS facility, and depositions of prison officials and staff.

The plaintiff filed a motion for partial summary judgment on the issue of the constitutionality of the defendants' blanket strip-search policy on January 23, 2006.  The defendants responded to the plaintiff's motion a month later and filed their

own motion for summary judgment, to which the plaintiff responded.

In their motion, the defendants argued in part that the search policy was justified by the PPS's need for security and safety. They maintained that the policy was necessary to prevent detainees from smuggling contraband into the prison system. See Def. Mot. for Summary Judgment at 21-23. They also argued that the search of Ms. Boone was reasonable due to her prior history of criminal charges, which included a conviction for simple assault, possession of an instrument of crime, recklessly endangering another person, and criminal conspiracy. See id. at 32; Parties' Motion for Class Cert. and Settlement at 4-5.

Oral argument on the parties' summary judgment motions was held before the Court on April 27, 2006. After the hearing, the Court dismissed with prejudice the individually-named defendants and the PPS from the case upon stipulation of the parties. The City remained as the sole defendant. The parties also stipulated to a discovery and briefing schedule with respect to class certification. The Court denied both parties' summary judgment motions without prejudice and held that the parties would have the opportunity to renew their motions after the issue of class certification was resolved.

In response to the City's argument that the search of Ms. Boone was reasonable based upon her criminal history, the

plaintiff amended the complaint to add class representative George Byrd. Mr. Byrd was charged with driving under the influence when admitted to the prison. He had no previous history of violent crime. <u>See</u> Mem. in Support of Plaintiff's Unopposed Motion to Amend the Class Action Compl. at 2.

The parties conducted additional discovery on the issue of class certification for almost six months. They interviewed hundreds of class members to establish that a substantial number of pretrial detainees would be within the class definition. They also reviewed hundreds of the prison's disciplinary records to determine how many misdemeanor detainees attempted to smuggle contraband into the PPS facility.

The plaintiffs filed their motion for class certification on February 16, 2007, and the defendants responded on April 16, 2007. The plaintiffs also filed a motion for preliminary injunction on March 23, 2007.

A hearing on both of the plaintiffs' motions was held on June 28, 2009. At the hearing, the City informed the Court that it was preparing procedures for the use of equipment that would be used in lieu of strip-searching.

In view of the City's proposed change in policy, the Court referred the matter to Magistrate Judge Elizabeth Hey for settlement. Negotiations began in July of 2007. The parties met with Judge Hey eleven times over the course of the year. These

negotiations concluded with a mediation held on July 21, 2008, before retired Magistrate Judge James R. Melinson, in which settlement was reached.

After reaching the settlement, the parties memorialized the terms in a Settlement Agreement, prepared for the administration of the settlement, and drafted the class notice. They executed the proposed Settlement Agreement on February 20, 2009.

B.  The Settlement Agreement

The Settlement Agreement divides the Settlement Class into two subclasses, defined as follows:

> All persons who were placed into the custody of the Philadelphia Prison System after being charged with misdemeanors; summary offenses; traffic infractions, civil commitments, or other minor crimes; or bench warrants and/or probation violations where the underlying charge was a misdemeanor, summary offense or other minor crime; and who were strip-searched in the absence of reasonable suspicion upon their entry into the Philadelphia Prison System pursuant to the policy, custom and practice of the Philadelphia Prison System and the City of Philadelphia.  The class period commences on April 21, 2003 and extends to, and includes, October 9, 2007.

> Subclass I:

> All persons in the Settlement Class, EXCEPT for persons who (1) were charged with certain violence, drug and/or weapons (hereinafter "VDW") related misdemeanor charges at the time of their admission, or (2) were charged

with bench warrants and/or probation
violations where the underlying charge was a
VDW misdemeanor charge, or (3) had
convictions for felonies and/or VDW
misdemeanor charges predating the date of
their admission.

Subclass II:

All persons in the Settlement Class who were
(1) charged with VDW misdemeanor charges at
the time of their admission, or (2) were
charged with bench warrants and/or probation
violations where the underlying charge was a
VDW misdemeanor charge, or (3) had
convictions for felonies and/or VDW
misdemeanor charges predating the date of
their admission.

Settlement Agreement at 7.

The Settlement Agreement recognized that the City had

changed its policy to stop strip-searching all pretrial detainees

on a blanket basis and to stop strip-searching misdemeanor

detainees in the absence of reasonable suspicion.  See id. at 10.

The City adopted a model policy that uses modern technology such

as metal-detecting chairs and ion scanners to thoroughly search

all pretrial detainees without a strip-search.  See Parties' Mot.

for Class Cert. and Settlement at 3.

The Settlement Agreement states that the City's current

written policy has been reviewed by the City of Philadelphia Law

Department for compliance with state and federal law.  The City

maintains that the current policy is constitutional.  The

Settlement Agreement requires that all correction officers have

access to the policy.  Current and new corrections officers have

been, and will continue to be, trained on the policy.  The Settlement Agreement also states that the policy will be posted in the intake area of the PPS.  See Settlement Agreement at 10-11.

The Settlement Agreement creates a fund to compensate the class members in the amount of $5,900,000.  See id. at 8. All administrative expenses, including the costs of settlement administration, website maintenance, notice to class members and attorneys' fees, costs and incentive awards will be deducted from the settlement fund prior to determining the amount of distribution.  See id. at 11-12.  An amount of the fund, not to exceed $330,000, was to be dedicated to the settlement administrator to cover the costs of notice and administration. See id. at 11.

Class counsel agreed that they would not seek more than 30% of the entire Settlement Fund in attorneys' fees.  See id. at 14.  The Settlement Agreement also states that an award of $15,000 will be requested for each of the class representatives.

The Settlement Agreement provides that the total amount of the fund dedicated to members of Subclass I is $5,170,000, to be granted pro rata to each class member who submits a timely claim form, in an amount not to exceed $3,000 per class member. The amount dedicated for Subclass II is $400,000, with a cap of $100 per claimant.  See id. at 12.  If the final approval of the

settlement is appealed and some portion of the Settlement Fund is not subject to the dispute, the undisputed portion was to be distributed in accordance with the Settlement Agreement. See id. at 14.

Notice was to be provided by the direct mailing of class notice and a claim form to all identifiable individuals in the Settlement Class. The Settlement Agreement also provides that notice would be given by television advertisement. The settlement administrator was also instructed to establish a website and maintain a toll-free number. Copies of the class notice and claim form were to be available by request over the phone, and downloadable copies of the documents would be available at the website. See id. at 15-16.

The Settlement Agreement provided the method for class members to submit requests for exclusion in writing. It also provided the process for objecting to the settlement, including the reservation of the right to appeal final judgment of the settlement. See id. at 16-17.

The Settlement was preliminarily approved by this Court on March 6, 2009.

C.    <u>Notice to the Class</u>

The claims administrator attests that notice went out to 37,159 putative class members on May 1, 2009, by way of regular mail.  <u>See</u> Parties' Mot. for Class Cert. and Settlement, Affidavit of RSM McGladrey, Inc., Exhibit C.  All mail that was undeliverable because of inaccurate addresses was investigated using a locator database to ascertain the correct address and then re-mailed to the members of the class where possible.

The administrator also contracted with a website administrator to create a website that provided information to the class in both English and Spanish.  The administrator also established a toll-free phone number and handled incoming telephone calls and written correspondence from prospective class members.  <u>See</u> <u>id.</u>

The administrator provided further notice by way of publication in the <u>Philadelphia Tribune</u>, <u>Philadelphia Al Dia</u> and the <u>Philadelphia Daily News</u> on May 4, 2009, and again in the <u>Philadelphia Daily News</u> on August 17, 2009.  Finally, the administrator provided notice through television during the weeks of April 27, 2009 and May 4, 2009.  <u>See</u> Parties' Mot. for Class Cert. and Settlement at 1-2.

D.    The Response of the Class

The claims administrator received 7,647 claims forms, 5,321 of which represent claimants who appear in the City's records, a claims rate of 15%.  See id. Exhibit C.[1]   Five members of the class opted out.  See Parties' Mot. for Class Cert. and Settlement at 2.

The parties report that the individual members of Subclass I will receive approximately $1,400.  Members of Subclass II will receive approximately $100.  See id.

Due to the volume and response of the class, the administrator spent an extra $211,220.00 above the original $330,000 earmarked for class administration costs.  The parties have requested that the Court award an additional $100,000.00 to the administrator, providing a total of $430,000 in administrative costs.  See id.

Three objectors submitted written objections to the proposed settlement.  Two of the objectors, Kuwsh Muhammad and Thomas R. Mundy, object to issues concerning the second subclass. See Objection of Kuwsh Muhammad; Objection of Thomas R. Mundy. Mr. Muhammad is a member of Subclass II because he was arrested on violent, drug or weapons-related charges.  He objects to the difference in recovery amount between the two subclasses.  Mr.

---

[1]The 2,326 other claims forms are currently marked as ineligible because the individuals who submitted them do not appear in the City's records.

Mundy is a member of Subclass II because of a previous felony conviction. He objects to his exclusion from Subclass I based upon this previous conviction.

The third objector, Aole Blackman/Wright, objects to the fees and costs that will be deducted from the fund. <u>See</u> Objection of Aole Blackman/Wright. None of the objectors appeared at the fairness hearing.

> E.  Attorney's Fees, Expenses, and Class Representative Awards

Class counsel have requested 30% of the Settlement Fund for attorney's fees, which amounts to a payment of $1,770,000.00. <u>See</u> Pl.'s Joint Mot. for Fees and Expenses at 1. Class counsel also seeks reimbursement for out-of-pocket expenses of $70,094.24. <u>See</u> Declaration of Daniel C. Levin of October 2, 2009. Finally, class counsel requests a special award of $15,000 for the two named class representatives. <u>See</u> Pl.'s Joint Mot. for Fees and Expenses at 21-22.

## II.  <u>Discussion</u>

The Court decides the following four questions:

A)  whether the proposed class can be properly certified under Federal Rule of Civil Procedure 23;

B)  whether notice to the class regarding the settlement and attorneys' fees petition was adequate;

C)    whether the settlement itself is fair, reasonable and adequate; and

D)    whether class counsels' petition for attorneys' fees, out-of-pocket expenses and special awards to the class representatives should be approved.

As preliminary matter, the Court will discuss the law relating to the constitutionality of a strip-search policy like the one at issue here.

The Supreme Court has held that a court must analyze a prison's strip-search policy under the Fourth Amendment.  See Bell v. Wolfish, 441 U.S. 520 (1979).  In Bell, a federal short-term custodial facility had a policy to strip-search all pre-trial detainees after a contact visit with an outside visitor. The Court found that, under the circumstances, the strip-searches conducted under the policy were not unreasonable under the Fourth Amendment.  See id. at 559.

In determining the reasonableness of a prison's search policy, the Bell Court held that courts must balance the prison's significant and legitimate interests in safety and security with the privacy interests of the individuals.  See id. at 559-60.  It presented four factors for a court to consider in that balance: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted.  See id. at 559.

The Court in Bell found that the prison's policy was reasonable under this standard because the interest in preventing

contraband from entering the prison facility outweighed the privacy interests of the inmates searched. The categorical reasonable suspicion that a prisoner might use contact with an outside visitor to smuggle contraband into the prison justified the invasiveness of the policy. See id. at 558.

Bell's holding was limited to the specific policy in question, and the Supreme Court left open the question of whether reasonable suspicion must be established to justify a policy to strip-search all incoming inmates or pretrial detainees. Since that time, however, ten Circuit Courts of Appeal and several district courts have addressed the issue.

Courts in eight circuits have held that a policy to strip-search all pre-trial detainees is unconstitutional under Bell.[2] These courts interpret Bell to require that a prison have reasonable suspicion that a particular arrestee is concealing weapons or other contraband before conducting a strip-search of that arrestee. Some of these courts have also concluded that Bell allows such reasonable suspicion to be established categorically for certain groups of prison detainees, such as

_____

[2]See Roberts v. Rhode Island, 239 F.3d 107 (1st Cir. 2001); Weber v. Dell, 804 F.2d 796 (2d Cir. 1986), cert. denied, 483 U.S. 1020 (1987); Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989), cert. denied, 493 U.S. 977 (1989); Jones v. Edwards, 770 F.2d 739 (8th Cir. 1985); Stewart v. County of Lubbock, 767 F.2d 153 (5th Cir. 1985), cert. denied, 475 U.S. 1066 (1986); Hill v. Bogans, 735 F.2d 391 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir. 1983); Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981), cert. denied, 455 U.S. 942 (1982).

13

those charged with felonies or violent or drug-related misdemeanors.[3]

One circuit court, however, recently broke with the majority and overruled its previous decisions on this issue. <u>See Powell v. Barrett</u>, 541 F.3d 1298 (11th Cir. 2009) (overruling <u>Wilson v. Jones</u>, 251 F.3d 1340 (11th Cir. 2001)). The court in <u>Powell</u> held that a blanket strip-search policy for all arrestees can be constitutional under <u>Bell</u>. It reasoned that the <u>Bell</u> balancing test allows for the interest of prison security to outweigh the individual privacy interests of detainees, regardless of whether there is reasonable suspicion that the particular arrestee is concealing weapons or contraband. <u>See id.</u> at 1309-12.

Another circuit is reconsidering its line of cases on the issue[4] and rehearing a strip-search case en banc. <u>See Bull v. City and County of San Francisco</u>, 539 F.3d 1193 (9th Cir. 2008), <u>rehearing en banc granted</u>, 558 F.3d 887 (9th Cir. 2009). The Court of Appeals for the Third Circuit has yet to rule on this issue.

---

[3]<u>See, e.g.</u>, <u>Weber</u>, 804 F.2d at 802; <u>Masters</u>, 872 F.2d at 1255; <u>Mary Beth G.</u>, 723 F.2d at 1272.

[4]<u>See</u> <u>Thompson v. City of Los Angeles</u>, 885 F.2d 1439 (9th Cir. 1989); <u>Kennedy v. Los Angeles Police Dept.</u>, 901 F.2d 702, 711 (9th Cir. 1989), <u>Giles v. Ackerman</u>, 746 F.2d 614 (9th Cir.1984), overruled on other grounds by <u>Hodgers-Durgin v. de la Vina</u>, 199 F.3d 1037 (9th Cir.1999) (en banc).

The plaintiffs in this case, therefore, would have to establish that the City's policy was unconstitutional under the Bell standard.  To do so, they must show that Bell requires a reasonable suspicion to conduct a strip-search of pre-trial detainees.  They must then show that, under the Bell factors, the policy was unreasonable as applied to all persons arrested for misdemeanors and minor crimes, including those charged with violence, drug, or weapons-related crimes and those with a previous felony or violence, drug, or weapons-related misdemeanor conviction.

A.   Class Certification

A court presented with a joint request for approval of a class certification and settlement must separate its analysis of the class certification from its determination that the settlement is fair.  See In re Insurance Brokerage Antitrust Litigation, 2009 WL 2855855 at *9 (3d Cir. September 8, 2009). To certify a class under Rule 23, a court must find that all four requirements of Rule 23(a) and at least one part of Rule 23(b) are met.  See Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

The Settlement Class includes all individuals who were placed into the custody of PPS after being charged with misdemeanors or other minor crimes and were strip-searched upon entry.  The class period commences on April 21, 2003 and extends to, and includes, October 9, 2007.  The Settlement Class is then

divided into two Subclasses.  Subclass I includes all persons in the Settlement Class except those who (1) were arrested for violence, drugs or weapons-related misdemeanor charges, (2) were charged with bench warrants or probation violations where the underlying charge was a violence, drugs or weapons-related misdemeanor charge, or (3) had convictions for felonies or violence, drugs or weapons-related misdemeanors.  Subclass II includes all members of the Settlement Class excluded from Subclass I.

### 1.   Analysis Under Rule 23(a)

Federal Rule of Civil Procedure Rule 23(a) requires that four requirements be met in order for a to be certified: numerosity, commonality, typicality, and adequate representation. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997). The Court finds that the four requirements of Rule 23(a) are met.

### a.   The Numerosity Requirement

Rule 23(a)(1) requires a class to be so numerous that joinder of all members is impracticable.  Classes exceeding forty or more class members are generally held to meet the numerosity requirement.  See Stewart v. Abraham, 275 F.3d 220, 226-227 (3d Cir. 2001).  The Settlement Class consists of over 37,000 individuals.  Currently, 5,400 of those individuals have

submitted verified claims forms.  Because joinder of such a large class is impracticable, the plaintiffs satisfy the numerosity requirement.

### b.    The Commonality Requirement

Rule 23(a)(2) requires that there are questions of law or fact common to the class.  If class members share at least one question of law or fact in common, factual differences among the claims of the class members do not defeat certification.  <u>In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions</u>, 148 F.3d 283, 310 (3d Cir. 1998) (<u>In re Prudential</u>).  In this case, there is a legal issue common to all class members: whether the defendant's blanket policy of strip-searching all detainees upon admission was constitutional.  This satisfies the Rule 23(a)(2) commonality requirement.

### c.    The Typicality and Adequacy Requirements

Rule 23(a)(3) and (a)(4) require that the claims or defenses of the representative parties be typical of the claims or defenses of the class and that the representative parties will fairly and adequately protect the interests of the class.  The Court of Appeals for the Third Circuit has noted that these two inquiries tend to merge because both evaluate the relation of the claims and the potential conflicts between the class

representatives and the class in general.  <u>Beck v. Maximus, Inc.</u>, 457 F.3d 291, 296 (3d Cir. 2006).

The typicality inquiry centers on whether the interests of the class representatives align with the interests of the absent class members such that the former is working towards the benefit of the class as a whole.  <u>See</u> <u>In re Prudential</u>, 148 F.3d at 311.

Two distinct inquiries comprise the adequacy requirement.  <u>See</u> <u>In re Prudential</u>, 148 F.3d at 312.  The first inquiry determines whether any significant antagonistic interests or conflicts exist between the class representatives and absent class members.  The second inquiry looks to the experience and expertise of class counsel in representing the class.  <u>See</u> <u>id.</u>

If a court finds that a single class representative cannot represent the entire class, it may under Rule 23(c)(5) divide a class into subclasses where appropriate.  When class members have different claims or defenses or have conflicting or antagonistic interests, subclasses are appropriate.  Each subclass is then to be treated as a class within the rule, and each must have its own representative.  <u>See</u> <u>id.</u> at 312; <u>Amchem</u>, 521 U.S. at 627.

In this case, the parties have separated the settlement class into two subclasses:  Subclass I includes all persons in the Settlement Class except those who (1) were

arrested for violence, drugs or weapons-related misdemeanor charges, (2) were charged with bench warrants or probation violations where the underlying charge was a violence, drugs or weapons-related misdemeanor charge, or (3) had convictions for felonies or violence, drugs or weapons-related misdemeanors; Subclass II includes all members of the Settlement Class excluded from Subclass I.

The Court finds that the creation of subclasses is appropriate here because each of the two subclasses will have to make a different showing to establish that the City lacked the reasonable suspicion to strip search the subclass members. For the members of Subclass I to prevail on their claims, they must establish both that <u>Bell</u> requires a reasonable suspicion to conduct a strip search of all pre-trial detainees and that the City lacked such a reasonable suspicion with regard to them.

The members of Subclass II, however, will have to make the additional showing that the City could not strip-search them categorically based upon the reasonable suspicion that they are more likely to attempt to smuggle contraband into the prison due to the nature of the charges against them or their criminal history. The members of Subclass II therefore would have to show that reasonable suspicion to strip-search must be established individually and cannot be found categorically.

The proposed division into these two subclasses is reflected in the decisions of other courts,[5] in that courts routinely certify classes with definitions excluding individuals violence, drug, or weapons-related charges.[6]

The class representatives in this case have claims typical of, and no interests antagonistic to, members of their respective subclasses. Mr. Byrd who, represents Subclass I, was charged with a non-violence, drug or weapons-related misdemeanor and had no previous criminal history. Ms. Boone represents Subclass II. Although she was arrested for a non-violence, drug or weapons-related crime, she had a criminal history involving violent crimes.

Finally, class counsel in this case has substantial experience in litigating complex civil rights actions. They have served as class counsel in at least twenty strip-search class actions. Class counsel have also vigorously represented the

---

[5]At least one other district court has created subclasses along similar lines. See Ford v. City of Boston, 154 F.Supp.2D 131, 135 (D. Ma. 2001).

[6]See, e.g., Miracle v. Bullitt County, Ky., 2008 WL 3850477 (W.D. Ky. Aug. 15, 2008); Florence v. Bd. of Chosen Freeholders of County of Burlington, 2008 WL 800970, *6 (D.N.J. March 20, 2008); Johnson v. District of Columbia, 248 F.R.D. 46, 50 (D.D.C. 2008); Bull v. City and County of San Francisco, 539 F.3d 1193, 1195 (9th Cir. 2008); Sutton v. Hopkins County, 2007 WL 119892, *1 (W.D. Ky. Jan. 11, 2007); Tardiff v. Knox County, 218 F.R.D. 332, 336 (D. Me. 2004); Nilsen v. York County, 219 F.R.D. 19, 25 (D. Me. 2003); McBean v. City of New York, 228 F.R.D. 487, 490 (S.D.N.Y. 2005); Blihovde v. St. Croix County, Wis., 219 F.R.D. 607, 623 (W.D. Wis. 2003).

class through four years of litigation, including discovery and motion practice.  They fulfill the adequacy requirement of Rule 23(a).

For these reasons, the Court finds that the four requirements of Rule 23(a), numerosity, commonality, typicality and adequacy, are met in this case.

### 2.  Analysis Under Rule 23(b)

Once a court determines that the requirements of Rule 23(a) are met, it must consider whether the action is maintainable under one of the three parts of Rule 23(b).  The parties seek to have this class certified under Rule 23(b)(3).

Rule 23(b)(3) allows certification only if the questions of law or fact common to class members predominate over any questions affecting only individual members and if a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  This is commonly broken out into the so-called "predominance" and "superiority" requirements.  See In re: Ins. Brokerage Antitrust Litigation, 2009 WL 2855855 at *10.

Rule 23(b)(3) also provides a non-exhaustive list of factors to aid the court in determining whether a class action is the best method of adjudication:  (1) the class members' interests in individually controlling the prosecution or defense

of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  Although the fourth factor has been held to be not relevant in a settlement-only class certification, the other requirements of the rule "demand undiluted, even heightened, attention in the settlement context."  Amchem, 521 U.S. at 620.

### a.  The Predominance Requirement

Under Rule 23(b)(3), a court must determine that common questions of law or fact predominate over any questions affecting only individual members.  Predominance is found when common questions represent a significant part of the case and can be resolved for all members of the class in a single adjudication. See 7AA Charles A. Wright, et al., Federal Practice and Procedure § 1778 (3d ed. 2005).  To establish predominance, the plaintiffs must show by a preponderance of the evidence that the elements of their claim can be proven by evidence common to all in their class.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311-12 (3d Cir. 2008).

For the members of Subclass I, the question is whether the City's policy of strip-searching all pre-trial detainees in

the absence of reasonable suspicion violates the Fourth Amendment. General evidence of the policy and its blanket application to the subclass members will be required to prove the subclass's claim. Evidence of the circumstances of each individual search would not be necessary to prove this claim. This has led many courts to conclude that the common question of the constitutionality of such a blanket strip-search policy as applied to members of classes similar to Subclass I meets the predominance requirement.[7]

Members of Subclass II would need to prove that the City's policy was unconstitutional as applied to arrestees charged with violence, drug or weapons-related crimes or arrestees with a previous felony or violence, drug or weapons-related misdemeanor conviction. The members of this subclass must not only show that the City's policy was unconstitutional as applied to all arrestees, but also that the City was constitutionally required to establish reasonable suspicion for each individual arrestee before conducting a search. This common question of whether individualized reasonable suspicion is constitutionally required predominates over any individual questions within this subclass.

---

[7]See, e.g., Florence, 2008 WL 800970 at *12; Johnson, 248 F.R.D. at 56-57 (D.D.C. 2008); Sutton, 2007 WL 119892, *6-*9; Tardiff v. Knox County, 365 F.3d 1, 5-7 (1st Cir. 2004); Blihovde, 219 F.R.D. at 620-22; Maneely v. City of Newburgh, 208 F.R.D. 69, 76-77 (S.D.N.Y. 2001).

Within each subclass, then, a common issue predominates over any individual claims, and the elements of each claim can be proven with evidence common to all. The predominance requirement under Rule 23(b)(3) is therefore satisfied.

b. <u>The Superiority Requirement</u>

Under the superiority requirement, the court asks whether a class action, rather than individual litigation, is the best method for achieving a fair and efficient adjudication. <u>See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154 (3d Cir. 2001).

A class action in this case saves the time, effort and expense of litigating the claims of as many as 37,000 class members individually and guarantees uniform treatment of individual class members within their respective subclasses. The parties have not identified, and the Court is not aware of, any other strip-search litigation involving PPS or the City of Philadelphia. Because it is generally desirable to concentrate many smaller claims into a single forum, a class action is appropriate in this case. A class action is the superior method for adjudicating this particular matter.

Finding that the requirements of Rule 23(a) and Rule 23(b)(3) are met, the Court hereby certifies the class as presented by the parties.

B.    Notice

Under Rule 23(c)(2)(B), notice must be given to
potential class members by the best notice practicable under the
circumstances for all classes certified under Rule 23(b)(3).
This includes individual notice to all potential class members
that can be identified through reasonable effort.  Notice must,
in clear, concise and plain language, state:  (i) the nature of
the action; (ii) the definition of the class certified; (iii) the
class claims, issues or defenses; (iv) the class member's right
to enter an appearance by an attorney; (v) the class member's
right to be excluded from the class; (vi) the time and manner for
requesting exclusion; and (vii) the binding effect of settlement
on class members.  See Rule 23(c)(2)(B).  A court must determine
that notice was appropriate before evaluating the merits of the
settlement itself.  See, e.g., In re Prudential, 148 F.3d at 326-
27.

In this case, the notice given met the requirements of
Rule 23(c)(2)(3).  The notice, in all of the forms in which it
was disseminated, described the proposed settlement, its terms,
and the nature of the claim filed on behalf of the class.  It
also described the class members' right to object or to be
excluded from the settlement, including their opportunity to be

heard at the fairness hearing, and the binding effect of the settlement on those who choose not to opt out.

Individual notice forms were mailed to 37,159 identified class members. Those notifications that were returned as undeliverable were re-sent if another address could be found using a locator database. Notice was also provided by way of publication in the <u>Philadelphia Tribune</u>, <u>Philadelphia Al Dia</u> and the <u>Philadelphia Daily News</u> and through television advertisements. <u>See</u> Parties' Mot. for Class Cert. and Settlement, at 1-2.

Because individual notices were sent to all identified class members and because the notice was widely disseminated through local publications and television broadcasts, the Court finds that the notice given meets the requirements of Rule 23(c)(2)(B).

     C.   <u>Approval of the Settlement</u>

In order to approve a class settlement, a court must find that the settlement is fair, reasonable and adequate and in the best interests of the class under Rule 23(e). <u>In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation</u>, 55 F.3d 768, 785 (3d Cir. 1995) (<u>In re General Motors</u>). When considering a class settlement, the "court plays

the important role of protector of the [absent class members']
interests, in a sort of fiduciary capacity." Id.

In Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), the
Court of Appeals for the Third Circuit set forth the following
nine specific factors that a district court should consider in
determining whether a settlement is fair, reasonable and
adequate:  (1) the complexity, expense and likely duration of the
litigation; (2) the reaction of the class to the settlement; (3)
the stage of the proceedings and the amount of discovery
completed; (4) the risks of establishing liability; (5) the risks
of establishing damages; (6) the risks of maintaining the class
action through the trial; (7) the ability of the defendants to
withstand a greater judgment; (8) the range of reasonableness of
the settlement fund in light of the best possible recovery; (9)
the range of reasonableness of the settlement fund to a possible
recovery in light of all the attendant risks of litigation.  Id.
at 157.

Applying these factors, the Court is satisfied that the
Settlement is fair, reasonable and adequate to the class members.


1.   The Risks of Establishing Liability and Damages

The risks of establishing liability and the risk of
establishing damages will be discussed first because these two
factors require close attention here.  The Court concludes that

27

there is a risk of establishing liability in this case, due to
the uncertainty of the law on the constitutionality of blanket
strip-search policies such as the one used by the City. Even if
liability is established, the Court concludes that there is a
risk of establishing damages. The Court further concludes that,
because of the increased risk for the members of Subclass II, the
creation of the subclasses and corresponding difference in
settlement amounts is fair, reasonable and adequate under these
factors.

            a.    The Constitutionality of the Defendant's
                  Strip-Search Policy

        The status of the case law surrounding the
constitutionality of the use of blanket strip-search policies in
the prison context has become increasingly uncertain. Courts in
several circuits have held that, under <u>Bell</u>, the constitution
requires strip and visual body cavity searches to be justified by
at least a reasonable suspicion that the individual arrestee is
concealing contraband or weapons.[8]  These courts have held that it
is unconstitutional for a prison to have blanket policies that
circumvent a minimal-threshold of reasonable suspicion for
arrestees charged with misdemeanors and other minor crimes.

    The Court of Appeals for the Eleventh Circuit's recent

_____

    [8]<u>See</u> <u>supra</u> at n. 2.

decision in <u>Powell</u> rejecting this reading of <u>Bell</u> has created a split in the circuits on this issue.  <u>See</u> <u>Powell</u>, 541 F.3d at 1314.  The Court of Appeals for the Ninth Circuit has also decided to reconsider its line of cases on the issue and re-hear a strip-search case en banc.  <u>See</u> <u>Bull v. City and County of San Francisco</u>, 539 F.3d 1193 (9th Cir. 2008), <u>rehearing en banc granted</u>, 558 F.3d 887 (9th Cir. 2009).

The Court of Appeals for the Third Circuit has yet to decide this issue.  The District Court of New Jersey, however, recently certified the following question to the Court of Appeals for interlocutory appeal:  "Whether a blanket policy of strip searching all inmates upon admission to a county correctional facility is violative of the inmates' constitutional rights?" See Florence v. Bd. of Chosen Freeholders of County of Burlington, 2009 WL 1971328 at *3 (D.N.J. June 30, 2009).

The law concerning the constitutionality of the defendant's blanket strip-search policy has therefore become increasingly uncertain.  Although this issue may have appeared to be more settled at the outset of litigation, the recent decision in <u>Powell</u>, the decision of the Court of Appeals for the Ninth Circuit to reconsider its precedent en banc, and the Court of Appeals for the Third Circuit's forthcoming consideration of the issue come together to make the state of the law more uncertain today.

Even if the plaintiffs were able to establish the City's liability, the amount of damages owed to the class members would present a challenge to the plaintiffs. Calculating the value of the plaintiffs' claims will depend upon a number of variables, including the circumstances and severity of the search and the effect of the search on the class members. A consideration of damages also weighs towards settlement.

                    b.    The Increased Risks of Liability for
                          the Members of Subclass II

The Court must also decide whether the disparity in recovery amounts between the subclasses is fair, reasonable and adequate. The Court concludes that the limited recovery to members of Subclass II is fair, reasonable and adequate when considering the increased risk to the members of Subclass II in establishing liability.

Courts in at least two circuits have stated that a violent or drug-related charge alone creates a reasonable suspicion that would allow prison authorities to strip-search pretrial detainees like those placed in Subclass II. See Masters, 872 F.2d at 1255 ("It is objectively reasonable to conduct a strip search of one charged with a crime of violence before that person comes into contact with other inmates"); Mary Beth G., 723 F.2d at 1272 (distinguishing the constitutionality of strip-searches where there is no reasonable suspicion for

pretrial detainees held on "inherently dangerous" crimes from the unconstitutionality of strip searches of "minor offenders"). Under this view, even if a court were to find that a blanket strip-search policy was unconstitutional as applied to the members of Subclass I, it could still find that the policy was constitutional as applied to individuals charged with violence, drug or weapons-related crimes. These members of Subclass II, therefore, have more of a risk in establishing liability than the members of Subclass I.

Class definitions in similar strip-search class actions often exclude individuals with violence, drug or weapons-related charges.[9] In this case, these subclass members will still receive some relief, which is a more generous result than similarly-situated individuals in other cases have received. This fact, coupled with the greater risk in establishing liability, makes the settlement for these members of Subclass II under the fourth and fifth Girsh factors fair, adequate and reasonable.

There is similar support for the inclusion of individuals with preexisting felony or violence, drug or weapons-related misdemeanor convictions in Subclass II. At least one court has explicitly held that reasonable suspicion exists to

---

[9] See, e.g., Bull, 539 F.3d at 1195; McBean, 228 F.R.D. at 490; Tardiff v. Knox County, 365 F.3d at 5 (1st Cir. 2004), affirming Nilsen v. York County, 219 F.R.D. 19, 19-20 (D. Me. 2003) and Tardiff v. Knox County, 218 F.R.D. 332, 336 (D. Me. 2004); Sutton, 2007 WL 119892 (W.D. Ky. Jan. 11, 2007).

strip-search all temporary detainees with prior records of felony or violence, drug or weapons misdemeanor-misdemeanor convictions. See Smith v. Montgomery County, Md., 643 F.Supp. 435, 439 (D. Md. 1989) ("Reasonable suspicion also exists to strip search all temporary detainees with prior records of convictions or unresolved arrests for felony offenses, or for misdemeanors involving weapons or contraband"). Other courts have held that a detainee's prior record is at least relevant in determining whether or not reasonable suspicion exists.[10] For similar reasons to those charged with violence, drug or weapons-related crimes, then, individual class members who are included within this category also stand an increased risk of not establishing liability than the members of Subclass I.

### 2. The Complexity, Expense, and Likely Duration of the Litigation

The first Girsh factor, the complexity, duration, and expense of the litigation, weighs towards settlement in this

---

[10] See Giles, 746 F.2d at 617 ("Reasonable suspicion may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record"); Boyd, 613 F.Supp. at 1525 (finding that reasonable suspicion "could be based on the nature of the offense, the detainee's criminal history, the demeanor of the individual, and the results of any other search ... which the defendants may choose to conduct"); Ninneman, 612 F.Supp. at 1071; Hunter, 672 F.2d at 671 (noting that the strip-searched parties had never been convicted of a drug offense).

case.  At trial, the plaintiffs would face the task of proving

the unconstitutionality of the defendant's policy, which would be

complex, expensive and, as discussed in more detail above, risky.

These facts make settlement the best option under the first <u>Girsh</u>

factor.


### 3.    The Reaction of the Class to the Settlement

The second factor, reaction of the class, also favors

approval of the settlement.  Out of over 37,000 potential class

members, only three have formally objected.  A low number of

objectors compared to the number of potential class members

creates a strong presumption in favor of approving the

settlement.  <u>See</u> <u>In re Cendant Corp. Litigation</u>, 264 F.3d 201,

234-35 (3d Cir. 2001).  Moreover, only five class members chose

to opt out of the class.  The fact that so few potential class

members objected to or opted out of the settlement supports a

finding of general acceptance of the settlement in the class.


### 4.    The Stage of the Proceedings and the Amount of Discovery Completed

The third factor, the stage of the proceeding and the

amount of discovery, similarly weighs towards acceptance of the

settlement.  Post-discovery settlements are more likely to

reflect the true value of the claim.  <u>Bell Atlantic Corp. v.</u>

<u>Bolger</u>, 2 F.3d 1304 (3d Cir. 1993).  Discovery has been extensive

here, with numerous depositions taken and hundreds of documents reviewed by the parties. The discovery and other investigations that the parties have undertaken render them sufficiently informed to make a determination about the fairness of a settlement.

> 5.   The Risks of Maintaining the Class Action
>      Through Trial and the Ability of the
>      <u>Defendants to Withstand a Greater Judgment</u>

The sixth and seventh <u>Girsh</u> factors, the risk of maintaining the class action through trial and the ability of the defendants to withstand a greater judgment, are neutral issues in this particular case.

Although there are no factors to indicate a likelihood that this class could not have been maintained through trial, there is always some risk of decertification in any class action. The risk of decertification is therefore present here, but it is no more substantial than the risk present in any class action.

Similarly, the defendants in this case, a major city, should under normal circumstances be able to withstand a greater judgment. Taking into consideration the current financial situation of the City, however, the plaintiffs do have cause to be genuinely concerned about the ability of the defendant to allocate its resources to a greater judgment.

6.  The Reasonableness of the Settlement in Light
    of the Best Possible Recovery and the
    Attendant Risks of Litigation

Finally, the eighth and ninth factors, the reasonableness of the settlement in light of the best possible recovery and the attendant risks of litigation, support approval of the settlement.  The reasonableness of a proposed settlement depends in part upon a comparison of the present value of the damages the plaintiffs would recover if successful, discounted by the risks of not prevailing.  In re General Motors, 55 F.3d at 806.

Considering the risks of litigation and the uncertainty of the law in this area, the disparity between the settlement amount and a possibly greater recovery amount is reasonable. Moreover, the approximately $1400 granted to the members of Subclass I is commensurate with the amounts received by class members in settlements of similar actions.[11]  The approximately $100 granted to the members of Subclass II is also fair given that individuals meeting the definition of Subclass II are often completely excluded from recovery in strip-search cases.  Because

_____

[11]See Hicks v. The County of Camden, 05-cv-1857 (D.N.J. June 9, 2008) (awarding an estimated $1,025 per claimant); McBean v. City of New York, 233 F.R.D. 377, 388 (S.D.N.Y. 2006) (awarding either $750 or $1000 per claimant, depending upon the number of times the prisoner was searched); Kahler v. County of Rensselaer, No. 03-cv-1324 (N.D.N.Y. 2004) (awarding $1,000 per claimant) Doan v. Watson, 2002 WL 1730917 (S.D. Ind. Dec. 4, 2002) (awarding $1,000 per claimant).

of the risk that the class members might not recover at all and because the amounts received are commensurate with, and even exceed, the amounts awarded in similar class actions, these last two factors weigh towards granting the settlement.

After applying the <u>Girsh</u> factors, the Court concludes that the settlement is fair, reasonable and adequate under Rule 23(e).  All but two of the <u>Girsh</u> factors weigh in favor of approving the settlement.  Those other two factors are neutral. For these reasons, the Court approves the Settlement under Rule 23(e).


D.   <u>The Attorneys' Fee Petition</u>

Class counsel in a class action who recovers a common fund for the benefit of persons other than himself or his client is entitled to a fair and reasonable award of attorneys' fees from the fund as a whole.  <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 478 (1980).  Class counsel calculate their fee award using the percentage-of-recovery method, which is the method favored in common fund cases.  <u>See In re General Motors</u>, 148 F.3d at 333. They also use the alternative method of fee calculation, the lodestar method, as a cross-check in order to ensure that the fee amount is reasonable.  <u>See, e.g.</u>, <u>In re Insurance Brokerage Antitrust Litigation</u>, 2009 WL 2855855 at *31.

As a result of these calculations, class counsel seek an award of attorney's fees of 30% of the $5.9 million settlement fund, which amounts to $1,770,000.  Class counsel also seek a reimbursement of out-of-pocket expenses of $70,094.24.  They also request that the Court award an additional $100,000.00 to the claims administrator.  Finally, class counsel request an award to the class representatives of $15,000 each.

The Court finds that all of these requests are reasonable and grants class counsels' motion.

### 1.    The Reasonableness of the Fees

When the percentage-of-recovery method is used to determine attorneys' fees in a common fund case, the Court of Appeals for the Third Circuit requires the district courts to consider seven factors for determining the reasonableness of the fee.  Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000).  These are:  (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.  Gunter, 223 F.3d at 195 n.1.

37

All factors weigh in favor of approving the attorneys' fee
petition in this case.

The first _Gunter_ factor, the size of the fund created
and number of persons benefitted, favors the fee amount, as class
counsel were able to obtain a sizable result, $5.9 million, for a
potential class of 37,000 individuals.

The second factor, the number of substantial
objections, also weighs in class counsels' favor.  Only three
objections have been entered to the settlement generally and just
one to the proposed attorney's fees and costs.

The third factor, the skill and efficiency of the
attorneys involved, supports approval of the attorneys' fee
request.  Class counsel are highly skilled in this area and have
conducted at least twenty other strip-search class actions.  The
submissions made in this case were thorough and of high quality.
Finally, class counsel worked effectively and efficiently to
bring this action to settlement.  The skill and efficiency
brought to this action by class counsel support the fee request.

The fourth and fifth factors, the complexity and
duration of the litigation and the risk of nonpayment, also
support approval of class counsels' fee request.  As discussed
above, this case involves a complicated issue of constitutional
law, the outcome of which has become increasingly uncertain over
the time of this litigation.  Class counsels' work was performed

on a contingent basis, and they have not been reimbursed.  Given
the four years spent on this litigation, the fee requested is
reasonable for the time, effort and risk involved.

The sixth factor, the amount of time devoted by
counsel, supports the fee amount.  Class counsel documents
2,857.65 hours of contingent work on this litigation, justifying
the amount requested in their petition.  This determination is
confirmed by the reasonable outcome of the lodestar cross-check,
as discussed below.

The seventh Gunter factor, the awards granted in
similar cases, also supports the fee amount.  The percentage of
30% requested by class counsel is within the range the
percentages granted in similar cases and class action settlements
generally.  A study referenced by another court in this district
analyzed 289 class action settlements ranging from under $1
million to $50 million and determined that the average attorneys'
fees percentage to be 31.71% and the median to be one-third.  In
re Rite Aid Corp. Securities Litigation, 146 F.Supp.2d 706, 735
(E.D.Pa. 2001) (affirming a fee amount of 25%).  Furthermore, a
30% fee percentage is commensurate with other strip-search class
actions conducted by class counsel.[12]

---

[12]See Suggs v. Cumberland County, 1:06-CV-00087 (D.N.J.)
(approving a 30% fee percentage); Boiselle v. Mercer County,
3:06-CV-2065 (D.N.J.) (same); Clark v. County of Salem, 07-CV-
2259 (D.N.J.) (same); Hicks v. County of Camden, 1:05-CV-1854
(D.N.J.) (approving a 27.5% fee percentage).

Under the <u>Gunter</u> factors, then, an attorneys' fee award of 30% of the fund is reasonable.

The lodestar cross-check analysis further supports the reasonableness of the attorney's fees. Under the lodestar method, the court calculates the proper fee by multiplying the number of hours spent on the litigation by an appropriate hourly rate. <u>See</u> <u>In re General Motors</u>, 55 F.3d at 819 n.37. Although the resulting multiplier need not fall within any pre-defined range, the Court of Appeals for the Third Circuit has noted that multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied. <u>See</u> <u>In re Prudential</u>, 148 F.3d at 341.

In this case, class counsels' requested fee produces a multiplier of 2.3 using the historic rate calculation, a method by which hours expended by each attorney are grouped into historical time periods and multiplied by the attorney's hourly rate for that time period.[13] A multiple of 2.3 reached under the historic rate calculation is safely within the reasonable multiplier range and confirms the reasonableness of class counsels' fee request.

---

[13]Courts also use the "current lodestar method," by which the total hours expended by each attorney are multiplied by that attorney's hourly rate at the conclusion of the case. <u>See, e.g.</u>, <u>Missouri v. Jenkins</u>, 491 U.S. 274, 283-84 (1980); <u>New York State Ass'n for Retarded Children, Inc. v. Carey</u>, 711 F.2d 1136, 1153 (2d Cir. 1983). Class counsel reports that under this method "the lodestar amount would be higher but the multiplier would be lower." Pl.'s Joint Mot. for Fees and Expenses at 20 n.9.

## 2.   Reimbursement of Out-of-Pocket Expenses

Class counsel have requested additional reimbursement in the amount of $70,094.24 for their out-of-pocket expenses for the management of the common fund for the benefit of the class members.

Class counsel provided a breakdown for each firm or lawyer that separates the out-of-pocket expenses into broad categories.  The categories include amounts spent for postage, mail and courier services; photocopying; telephone and facsimile; filing and litigation fees; meals, hotels, and transportation; publications; research; and assessments.  The totals for each category are reasonable expenses for a large, complex, multi-year litigation.

Finally, class counsel has requested that the Court grant an additional $100,000.00 to the administrator for extra class administration costs.  This request is reasonable and is granted.

The Court therefore approves class counsels' request for an award of out-of-pocket expenses in the amount of $70,094.24 and the award of an additional $100,000.00 to the claims administrator.

### 3. Awards to the Class Representatives

Class counsel requests a special award of $15,000 for each class representative. Other strip-search settlements provide similar awards to class representatives.[14]

These awards, though high, are justified by the benefit provided to the absent class members. The class representatives have accepted the public exposure of the fact that they have been placed into custody and charged with a crime. They do so for the benefit of the class, and the Court finds that these awards are reasonable compensation for the sacrifice of their anonymity.

## V. Conclusion

For the reasons herein stated, the Court grants the plaintiffs' and defendant's Motion for Final Approval of Settlement and Class Certification. The Court hereby certifies the class and approves the settlement in this class action as described in that motion.

The Court also grants class counsels' Joint Motion for Fees and Expenses.

An appropriate Order shall issue separately.

---

[14]See Hicks v. City of Camden, No. 05-CV-1857 (awarding $15,000 to two class representatives); Suggs v. Cumberland County, 1:06-CV-00087 (D.N.J.) (same); Boiselle v. Mercer County, 3:06-CV-2065 (D.N.J.) (awarding $20,000 to one class representative); McBean v. City of New York, 233 F.R.D. 377, 391-92 (S.D.N.Y. 2006) (awarding between $25,000 and $35,000 to class representatives).